DECISION AND JUDGMENT ENTRY
Teddy Mosley appeals his conviction and sentence in the Scioto County Court of Common Pleas for three counts of involuntary manslaughter and two counts of aggravated vehicular assault. He assigns the following errors:
 THE DEFENDANT WAS DENIED HIS DUE PROCESS RIGHT TO A FAIR TRIAL AS A RESULT OF THE PROSECUTOR FAILING TO DISCLOSE SUBSTANTIAL MATERIAL EXCULPATORY EVIDENCE AND IS THEREFORE ENTITLED TO A NEW TRIAL.
 THE TRIAL COURT ERRED WHEN IT DENIED DEFENDANT'S MOTION FOR A NEW TRIAL.
Defendant is entitled to a new trial based on prosecutorial misconduct in failing to disclose substantial material exculpatory evidence which had it be been disclosed, the outcome of the trial would have been different.
Defendant is entitled to a new trial based on newly discovered evidence that could not with reasonable diligence have been discovered prior to trial.
The trial court erred when it denied Defendant's motion for a new trial summarily without disclosing its reasons and without conducting an evidentiary hearing.
 THE TRIAL COURT ERRED WHEN IT SENTENCED DEFENDANT TO CONSECUTIVE TERMS.
Finding no merit in any of appellant's assigned errors, we affirm the trial court's judgment.
 I.
On the evening of October 30, 1999, a Mercury Cougar owned by appellant crossed the center line on State Route 348 in Scioto County and was struck on the passenger side by a Ford Aerostar mini-van driven by Pam Griffith. Angel Spradlin, Randy Mosley, Jr., Craig Fitzpatrick, and appellant were all occupants of the Cougar. Spradlin, Mosley and Fitzpatrick died as a result of the collision; appellant was seriously injured. Pam Griffith and her son, Brandon, were also seriously injured in the collision.
Appellant was charged with three counts of aggravated vehicular homicide, three counts of involuntary manslaughter, and two counts of aggravated vehicular assault. His defenses at trial were: (1) that he was not driving the vehicle, and (2) the collision was a result of Charlotte Blanton, who was following the appellant, striking the rear of the Cougar with her Toyota 4-Runner, thus forcing him into the oncoming vehicle. A summary of the trial testimony is attached as an appendix.
The jury found appellant not guilty of the three counts of aggravated vehicular homicide. However, the jury found appellant guilty of three counts of involuntary manslaughter and two counts of aggravated vehicular assault. The jury also found that appellant was not under the influence of alcohol while operating the motor vehicle. Appellant was sentenced to a total of twelve years incarceration. Following the trial, appellant filed a motion for a new trial based on newly discovered evidence and improper conduct by the prosecutor. The court denied this motion and appellant timely appealed.
 II.
In his first assignment of error, appellant argues that he was denied his due process right to a fair trial because the prosecutor failed to disclose exculpatory evidence to the defense. Specifically, appellant maintains that the prosecutor did not turn over the names of Jennifer Reed and James Compton, two emergency personnel involved with the accident, whose testimony would have aided the defense. Appellant contends that the prosecutor was aware of, or should have been aware of, Ms. Reed and Mr. Compton's testimony. He also contends that the Ohio State Highway Patrol investigators should have been aware of the names of the emergency personnel and other witnesses at the scene. Appellant argues that the prosecutor is deemed to have the knowledge that the state patrolmen, firefighters, and EMTs had. Appellant also argues that the state failed to disclose the identity of April Scarberry. In her affidavit, Ms. Scarberry states that she informed a state highway patrolman at the scene that Charlotte Blanton was involved in the accident but he did not believe her.
Implicit within the Fifth Amendment guarantee that the government shall not deprive a person of life, liberty, or property without due process of law, is the guarantee to criminal defendants of a fair trial. This guarantee imposes upon the prosecution a duty to reveal to the defense evidence tending to exculpate the defendant. Brady v. Maryland (1963),373 U.S. 83, 10 L.Ed.2d 215, 83 S.Ct. 1194; United States v. Agurs
(1976), 427 U.S. 97, 49 L.Ed.2d 342, 96 S.Ct. 2392.
The state's suppression of exculpatory evidence violates the defendant's due process rights irrespective of the good or bad faith of the prosecutor. State v. Johnston (1988), 39 Ohio St.3d 48, paragraph four of the syllabus. However, unless the defendant can demonstrate that the evidence the state suppressed was material, the defendant is not entitled to a new trial. Id. Evidence is deemed material "only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different."Johnston at paragraph five of the syllabus, following United States v.Bagley (1985), 473 U.S. 667, 682, 87 L.Ed.2d 481, 105 S.Ct. 3375. "A `reasonable probability' is a probability sufficient to undermine confidence in the outcome." Id., citing Bagley, supra, and Pennsylvaniav. Ritchie (1987), 480 U.S. 39, 57, 94 L.Ed.2d 40, 107 S.Ct. 989. This standard of materiality applies regardless of whether the defense requests the evidence specifically, generally, or not at all. Id. at paragraph five of the syllabus. "The mere possibility that an item of undisclosed information might have helped the defense, or might have affected the outcome of the trial, does not establish `materiality' in the constitutional sense." State v. Jackson (1991), 57 Ohio St.3d 29,33.
First, we consider the affidavits of Ms. Reed and Mr. Compton. Both stated that they were emergency personnel on the scene, that appellant was in the back seat of the Cougar, and that he was not the driver. Though Ms. Reed indicates that she informed her colleagues of her observations, neither Ms. Reed nor Mr. Compton states in their affidavits that they ever informed the prosecutor or the patrol. The police are considered part of the state's "prosecutorial machinery," and a police officer's knowledge of exculpatory information must, for purposes of discovery, be imputed to the state. State v. Wiles (1991),59 Ohio St.3d 71, 78, quoting State v. Tomblin (1981), 3 Ohio App.3d 17,18. Appellant asserts that, similarly, the knowledge of EMTs and firefighters must be imputed to the prosecutor. However, appellant has cited no case law to support this position and we see no rationale for expanding the definition of the "prosecutorial machinery" to include these people. The EMTs and firefighters involved in this case were not gathering evidence, attempting to solve a crime, or prosecuting appellant. In essence, their nexus with the state is too remote to impute their knowledge to the prosecution. Though it is preferable that EMTs, firefighters, and other emergency personnel provide the prosecutor with evidence that is pertinent to a criminal prosecution, their failure to do so does not affect a defendant's due process rights as does a police officer's failure to make such information known. The function of the emergency personnel was to save lives and they are involved in this case only to the same extent as other lay witnesses. Therefore, since there is no evidence that the prosecutor or investigators knew of the existence of these witnesses, appellant's due process rights were not violated by the state's failure to provide this information to the defense.
Appellant also argues that the police should have known of the existence of other witnesses to the accident. Appellant argues that the patrolmen failed to collect witnesses' names at the scene of the accident and failed to determine which emergency personnel responded to the scene. As a result, appellant did not learn the identities of several important witnesses. The patrolmen testified at trial that they were attempting to save as many lives as possible at the time of the accident and were not yet concerned with investigating the accident. Therefore, they asked non-emergency personnel to leave the scene. The collection of such information may have been helpful to both the state and the defense; however, we cannot quibble with the patrolmen's reasons for failing to take such action. More importantly, however, Brady applies only to the failure of the prosecution or law enforcement officers to disclose information they possess. It was not intended to punish the state for its failure to conduct a thorough investigation. Sloppy investigation does not inure a benefit to the state, but rather carries the risk of damage to the state's case. Appellant has not referred this Court to any case law that holds the state should be penalized for failing to disclose information that it possibly could have, but did not, obtain. Moreover, defense counsel was free to question the patrolmen regarding their failure to gather such information and, in fact, did so. Appellant's due process rights were not violated by the patrol's actions.
Appellant also argues that his due process rights were violated by the state's failure to notify him of April Scarberry's identity and statements to police. In her affidavit, Ms. Scarberry states that she heard the car accident and ran to the scene. When she arrived, Beth Mosley and Charlotte Blanton, the passenger and driver respectively of the Toyota 4-Runner, were hysterical. Beth told Ms. Scarberry that her head hurt because she struck it on the windshield of the Toyota when it hit the Cougar. Ms. Scarberry stated that she told a patrolman that Charlotte's truck was involved in the accident, but he refused to believe her.
At trial, both Beth and Charlotte denied that any contact had occurred between the Toyota and the Cougar. Trooper Larry Anderson testified that he examined the bumper of the Cougar and saw no indication that Charlotte's vehicle was involved in the crash. Trooper Jeffrey Moseley also testified that he saw no evidence to indicate that another vehicle struck the Cougar. The defense referred the jury to photographs of the Cougar and the Toyota 4-Runner to show damage allegedly caused by contact between the two vehicles, though the photographs of the 4-Runner were not taken until several months after the accident.
Ms. Scarberry asserts in her affidavit that she told a patrolman at the scene that Charlotte's truck was involved in the accident but does not provide a description of this officer or indicate his specific response to her allegation. Obviously, this evidence is relevant to appellant's case. However, Ms. Scarberry did not observe the truck strike the Cougar herself; rather, she made this statement to the police based on a statement by Beth Mosley. The testimony at trial established that other witnesses also told the police that there was a possibility that Charlotte's vehicle was involved in the accident. Because of these statements, the patrol examined Charlotte's vehicle and questioned her, but ultimately concluded that no contact occurred. Given the state of the evidence on this issue, we cannot conclude that there is a reasonable probability that the outcome of the case would have been different had Ms. Scarberry's identity and statement been disclosed to the defense. While there is a slight possibility that this evidence would have affected the outcome of the trial, this is insufficient to meet the standard outlined in Brady and its progeny.
Appellant's first assignment of error is overruled.
 III.
In his second assignment of error, appellant asserts that the trial court erred when it denied his motion for a new trial. Appellant argues that (1) there was prosecutorial misconduct in failing to disclose exculpatory evidence, (2) there was newly discovered evidence that could not with reasonable diligence have been discovered prior to trial, and (3) the trial court erred by failing to disclose its reasons for denying the motion and failing to conduct an evidentiary hearing.
We have addressed appellant's contention that the prosecutor engaged in misconduct in failing to disclose evidence favorable to the defense in the prior assignment of error. For the reasons stated in the first assignment of error, the court did not err in denying appellant's motion for a new trial based on prosecutorial misconduct.
A motion for a new trial based on newly discovered evidence is governed by the following standard:
 It must be shown that the new evidence (1) discloses a strong probability that it will change the result if a new trial is granted, (2) has been discovered since the trial, (3) is such as could not in the exercise of due diligence have been discovered before the trial, (4) is material to the issues, (5) is not merely cumulative to former evidence, and (6) does not merely impeach or contradict the former evidence.
State v. Hawkins (1993), 66 Ohio St.3d 339, 350, quoting State v. Petro
(1947), 148 Ohio St. 505, syllabus.
The decision to grant or deny a motion for a new trial is committed to the sound discretion of the trial court. State v. Matthews (1998),81 Ohio St.3d 375, citing State v. Schiebel (1990), 55 Ohio St.3d 71, paragraph one of the syllabus. We will not reverse a trial court's denial of a motion for a new trial absent an abuse of that discretion. Sharp v.Norfolk W. Ry. Co. (1995), 72 Ohio St.3d 307. An abuse of discretion implies that a court's ruling is unreasonable, arbitrary, or unconscionable; it is more than an error in judgment. State ex rel.Richard v. Seidner (1996), 76 Ohio St.3d 149.
Appellant submitted seven affidavits from various witnesses who stated that they observed events pertaining to the accident. Most of the witnesses stated that they observed appellant in the back seat of the Cougar following the accident. Jennifer Reed, an EMT, stated that she attended to appellant for approximately an hour, that he was in the back seat and that his legs were not under the steering wheel. Ms. Reed also stated that she expressed her opinion that appellant was not the driver of the vehicle to other EMTs. James Compton, a volunteer firefighter, likewise stated that appellant was in the back seat and his feet were underneath the driver's seat. Mr. Compton opined that there was no way appellant was driving. Doug Spriggs, who was traveling on State Route 348, made a similar statement in his affidavit.
Under the Rules of Evidence, the affiants' opinions that appellant was not the driver would not be admissible, though their observations regarding appellant's location following the accident would be. See Evid.R. 602 and Evid.R. 701 regarding personal knowledge and opinion testimony by lay witnesses. Nonetheless, the trial court did not abuse its discretion in concluding that appellant had not met the six-part test for requiring a new trial.
First, this evidence is generally cumulative to other evidence admitted at trial. Several trial witnesses testified that appellant was lying in the back seat of the automobile, while the state introduced several witnesses who testified that appellant was located on the back of the driver's seat, which was fully reclined into the backseat. Mortie Throckmorton, Tina Throckmorton, and Darren Hale all testified that appellant was in the back seat of the vehicle. While two of the affiants are trained medical personnel, that knowledge is not necessary to identify where a person is lying. The lay witnesses were equally capable of making such observations.
Appellant also submitted an affidavit from Sharon Cox who indicated that she was at the scene and saw girls who were hysterical. One of the girls said the accident was her fault because she didn't make one of the occupants ride with her. This information is also duplicative of testimony introduced at trial. Various witnesses testified that some girls at the scene appeared very upset and made various statements about the accident. Moreover, both Beth and Charlotte testified that they held themselves at least partly responsible for the accident.
Appellant has also failed to establish that this evidence could not in the exercise of due diligence have been discovered before trial. In his brief, appellant argues that defense counsel questioned the EMTs at the Rush Tonwship Fire Station and none of them disclosed that Jennifer Reed did not believe appellant was the driver. However, neither defense counsel nor any of his investigators submitted affidavits to the trial court indicating the steps that they took to locate other eyewitnesses and emergency personnel or whether they specifically asked the EMTs for the names of other emergency personnel present on October 30, 1999. Many of these witnesses came forward after trial because they heard local media coverage regarding appellant's convictions. Therefore, it is apparent that these witnesses were in the community and likely could have been located via a thorough investigation.
Most importantly, appellant has failed to establish a strong probability that the new evidence submitted in the affidavits would change the result of a new trial. The jury was faced with conflicting testimony regarding whether appellant was on top of the driver's seat or in the back seat following the car accident. This "new evidence" would not clearly resolve that question. Further, numerous witnesses testified that appellant was driving the car when the group left the party. Charlotte and Beth testified that they were either in front of or behind the Cougar from the time they left the party until the accident. Both women testified that appellant did not stop and allow someone else to drive. The defense attempted to establish that appellant stopped to get jackets after leaving the party; however, even if this is true, appellant presented no testimony that a new driver took appellant's place.
Appellant also relies on Ms. Scarberry's affidavit, which indicates that Beth told her at the scene of the accident that she injured her head when Charlotte struck appellant's vehicle. Ms. Scarberry also stated that in June 2000, Beth informed her that the day after the accident she and Charlotte had a private discussion regarding what they were going to say happened at the accident. Beth also reiterated her previous statement that she'd hit her head on the windshield when Charlotte struck the Cougar.
Initially, we must distinguish between the two types of statements. The statements at the scene of the accident would likely be admissible as substantive evidence given that, based on Ms. Scarberry's statements and those of other witnesses, Beth was extremely upset at the scene of the crash. Therefore, these statements would probably be admitted as excited utterances. See Evid.R. 803(2). The statements made in June 2000 were hearsay and fall under no obvious exception. However, they may have been admissible as impeachment evidence because Beth testified at trial that the Toyota never struck the Cougar. Newly discovered evidence which can be used solely for impeachment is an insufficient basis for a motion for a new trial. Hawkins, supra, at 350. Therefore, we must consider only the first statement made at the scene of the accident.
The statement Beth Mosley made to Ms. Scarberry was indisputably relevant and likely admissible. However, as discussed in the previous assignment of error, we cannot conclude that the evidence discloses a strong probability that the outcome of the trial would be different if a new trial were granted.
In conclusion, even considering this "new evidence" cumulatively, we cannot say that the trial court's denial of appellant's motion for a new trial was unreasonable, arbitrary, or unconscionable such that the court abused its discretion.
Appellant also argues that the court erred in failing to conduct a hearing and failing to disclose its reasons for denying appellant's motion for a new trial. It is well established that a trial court has broad discretion to determine whether it is necessary to hold an evidentiary hearing on a motion for a new trial. State v. Tomlinson
(1997), 125 Ohio App.3d 13; Toledo v. Stuart (1983), 11 Ohio App.3d 292;State v. Wells (Aug. 23, 1995), Scioto App. No. 94CA2255, unreported. Therefore, on appeal this decision will not be reversed absent an abuse of discretion. Appellant submitted affidavits from various witnesses outlining what their testimony would be and does not indicate how he would have benefited from a hearing. The court did not abuse its discretion in determining that a hearing was not necessary.
Crim.R. 33 does not require that the court state its reasons for denying a motion for new trial. Therefore, the court did not err in failing to disclose its reasons for denying appellant's motion.
Finding no merit, we overrule appellant's second assignment of error.
 IV.
In his third assignment of error, appellant argues that the court erred when it sentenced appellant to consecutive terms of incarceration. Appellant contends that a consecutive sentence of eleven years is disproportionate to the crime. He also argues that the court did not make specific findings to support the consecutive sentences.
An appellate court may reverse a felony sentence if it finds by clear and convincing evidence that the sentence is unsupported by the record, or that it is contrary to law. R.C. 2953.08(G)(2). "Clear and convincing evidence" refers to a degree of proof "which is more than a mere `preponderance of the evidence,' but not to the extent of such certainty as is required `beyond a reasonable doubt' in criminal cases, and which will produce in the mind of the trier of facts a firm belief or conviction as to the facts sought to be established." State v. Schiebel
(1990), 55 Ohio St.3d 71, 74.
A court may impose consecutive sentences under R.C. 2929.14(E)(4) when:
 * * * the court finds that the consecutive service is necessary to protect the public from future crime or to punish the offender and that consecutive sentences are not disproportionate to the seriousness of the offender's conduct and to the danger the offender poses to the public, and if the court also finds any of the following:
 (a) The offender committed the multiple offenses while the offender was awaiting trial or sentencing, was under a sanction imposed pursuant to section 2929.16, 2929.17, or 2929.18 of the Revised Code, or was under post-release control for a prior offense.
 (b) The harm caused by the multiple offenses was so great or unusual that no single prison term for any of the offenses committed as part of a single course of conduct adequately reflects the seriousness of the offender's conduct.
 (c) The offender's history of criminal conduct demonstrates that consecutive sentences are necessary to protect the public from future crime by the offender.
 The inquiry under R.C. 2929.14(E)(4) is a "tripartite procedure." State v. Hiles (Nov. 6, 2000), Hocking App. No. 99CA23, unreported, citing State v. Haugh
(Jan. 24, 2000), Washington App. No. 99CA28, unreported. First, the sentencing court must find that consecutive sentences are "necessary to protect the public" or to "punish the offender;" second, the court must find that the consecutive sentences are "not disproportionate" to the seriousness of the offender's conduct and the "danger" he poses; and finally, the court must find the existence of one of the enumerated circumstances in R.C. 2929.14(E)(4)(a) through (c). Id. The verb "finds," as used in R.C. 2929.14(E)(4), means that the court "must note that it engaged in the analysis" required by the statute. See State v. Edmonson (1999), 86 Ohio St.3d 324, 326; State v. Brice (Mar. 29, 2000), Lawrence App. No. 99CA21, unreported.
Additionally, the court must comply with R.C. 2929.19(B)(2)(c), which requires that the sentencing court "make a finding that gives its reasons for selecting the sentences imposed * * * if it imposes consecutive sentences under [R.C. 2929.14.]" The requirement that a court give its reasons for selecting consecutive sentences is separate and distinct from the duty to make the findings required by R.C. 2929.14(E)(4). Brice,supra.
In its sentencing entry, the trial court stated that
 [p]ursuant to Revised Code section 2929.14(E), the Court finds for the reasons stated on the record that consecutive sentences are necessary to protect the public from future crime or to punish the defendant and not disproportionate to the seriousness of the defendant's conduct and the danger the defendant poses to the public.
 Therefore, the sentences on all the counts in this case are to be served consecutively to one another.
 While the better practice would be for the trial court to make explicit findings and specify its reasons for the findings in the sentencing entry, we have previously held that the findings or reasons need not be specified in the sentencing entry so long as they are discernible from the record as a whole. Blair, supra, citing State v. Patterson (Sept. 21, 1998), Washington App. No. 97CA28, unreported. Therefore, we turn to the transcript to determine whether the court complied with the statutory requirements.
After hearing testimony from witnesses and family members of the victims, as well as argument from counsel, the court made the following statements regarding appellant's sentence:
* * *
 I do find that the defendant has been convicted of three counts of involuntary manslaughter. They were each a felony of the third degree. He has also been convicted of two counts of aggravated vehicular assault. Now, the Court does find that a prison term is consistent with the principles and purposes of sentencing.
 In this case, there were three young people killed as a result of this defendant's actions. There were two other people seriously injured due to this defendant's actions. The pain and suffering by the family is unimaginable to this Court. It is severe. It is horrendous.
 Up until today, I've noticed no remorse from this defendant. Of course, as a I said, there was serious injury and three deaths in this case. The Court further finds that the shortest prison term would demean the seriousness of this defendant's conduct. The Court further finds that the defendant has committed the worse [sic] form of the offenses.
 The harm caused by the defendant and his actions in this case were [sic] so great or unusual that no single prison term for any of the offenses committed would adequately reflect the seriousness of his conduct.
 It is therefore ordered that as to Counts 1, 2 and 3, they are each involuntary manslaughter charges, the defendant will be sentenced to a definite term of incarceration on each offense of three years. He will be fined the sum of $1,000 on each.
 Now, as to Counts 7 and 8. They're two convictions of aggravated vehicular assault. The defendant will be sentenced to one year stated prison term on each offense. He will be fined the sum of $1,000 on each offense.
 The Court finds that consecutive sentences are necessary to punish the defendant and they are not disproportionate to the seriousness of his conduct. Therefore, the sentences will run consecutive to one another.
* * *
 Appellant does not argue that the court failed to engage in the requisite "tripartite procedure" or make the requisite findings. The court found that: (1) consecutive sentences are necessary to protect the public from future crime or to punish the defendant; (2) consecutive sentences are not disproportionate to the seriousness of the defendant's conduct and the danger the offender poses to the public; and (3) the harm caused by the defendant and his actions was so great or unusual that no single prison term for any of the offenses committed would adequately reflect the seriousness of his conduct.
Prior to imposing consecutive sentences, the court noted that as a result of appellant's actions three young people were killed and that two people were seriously injured, that the families of the victims were enduring unimaginable pain and suffering, and that the court noticed no remorse from appellant prior to the day of sentencing. While the court did not explicitly state that these were its reasons for imposing consecutive sentences, it appears from the record that the court relied on these facts as the basis for its finding that consecutive sentences were appropriate. But cf. State v. Hiles (Nov. 6, 2000), Hocking App. No. 99CA23, unreported. Therefore, we conclude that the court's imposition of consecutive sentences was lawful.
Appellant also argues that his sentence was unlawful because it was not supported by the record. Specifically, appellant asserts that it was unjust to impose such a lengthy sentence upon a young adult when he did not intend to harm anyone, that there is no need to protect the public from appellant, that appellant has no history of criminal conduct, and that, because the jury found that alcohol was not the cause of the accident, the sentence was too severe. We disagree. As the trial court noted, three young people lost their lives as a result of appellant's actions. While appellant may not have specifically intended to kill three people and injure two others, he did intend to drive in an extremely dangerous manner. Moreover, the fact that appellant did not intend the results of his actions does not mean that he is not a danger to society or that his actions were any less harmful to the victims and the families of the victims. For these reasons and the reasons stated by the trial court, we conclude that the sentence is supported by the record and, therefore, not unlawful.
Appellant's third assignment of error is overruled.
 V.
Having overruled appellant's three assigned errors, we affirm the judgment of the trial court.
 JUDGMENT ENTRY
It is ordered that the JUDGMENT BE AFFIRMED and that the Appellee recover of Appellant costs herein taxed.
The Court finds there were reasonable grounds for this appeal.
It is ordered that a special mandate issue out of this Court directing the Scioto County Common Pleas Court to carry this judgment into execution.
IF A STAY OF EXECUTION OF SENTENCE AND RELEASE UPON BAIL HAS BEEN PREVIOUSLY GRANTED BY THE TRIAL COURT OR THIS COURT, it is temporarily continued for a period not to exceed sixty days upon the bail previously posted. The purpose of a continued stay is to allow Appellant to file with the Ohio Supreme Court an application for a stay during the pendency of proceedings in that court. If a stay is continued by this entry, it will terminate at the earlier of the expiration of the sixty day period, or the failure of the Appellant to file a notice of appeal with the Ohio Supreme Court in the forty-five day appeal period pursuant to Rule II, Sec. 2 of the Rules of Practice of the Ohio Supreme Court. Additionally, if the Ohio Supreme Court dismisses the appeal prior to expiration of sixty days, the stay will terminate as of the date of such dismissal.
A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure. Exceptions.
William H. Harsha, Judge.
Abele, P.J. Kline, J. Concur in Judgment and Opinion.
 APPENDIX — Summary of Testimony State's Case-in-Chief Michael Hobbs
Michael Hobbs testified that he is appellant's first cousin. On October 30, 1999, appellant and Craig Fitzpatrick came to Mr. Hobbs' house in appellant's new car, a Mercury Cougar. Appellant was drinking when he arrived and wanted Mr. Hobbs to go for a ride with them. Mr. Hobbs agreed to go with them but told appellant he would not let him drive. Mr. Hobbs drove appellant's vehicle. Mr. Hobbs stated that appellant was not drunk but had a beer when he came to the house. Craig was also drinking, though Mr. Hobbs was not. Randy Mosley Jr., a cousin of appellant and Mr. Hobbs, was also with the group for a little while.
Appellant and Craig left Mr. Hobbs at his house at 4:30 or 5:00 p.m. Between 6:30 and 7:30 p.m., appellant and Craig Fitzpatrick returned to Mr. Hobbs' house. When they arrived, Mr. Hobbs was changing into his Halloween costume. Randy and Angel Spradlin arrived at Mr. Hobbs' house in Angel's vehicle and Charlotte Blanton arrived a bit later. After Mr. Hobbs finished getting ready, everyone went to a Halloween party at Mr. Hobbs' mother's house.
Mr. Hobbs testified that his mother did not allow minors at the party and when she found out they were there, she asked several minors to leave. Mr. Hobbs walked to the end of the driveway with his uncle, Tim Mosley. Mr. Hobbs and Tim were standing at the end of the driveway at approximately 9:30-10:00 p.m. Charlotte and Beth Mosley, Randy's older sister, got into a truck. Appellant, Craig, Angel and Randy jumped into the truck with them. It was chilly out and Charlotte did not have the cap on the truck so appellant, Craig, Angel and Randy got into appellant's car. Mr. Hobbs testified that Randy was in the back seat behind appellant, who was driving. Craig was in the passenger side front seat and Angel was in the back seat on the passenger side. Mr. Hobbs testified that he observed appellant turn onto Route 348 east, heading towards Lucasville. Charlotte and Beth were in front of him.
About fifteen or twenty minutes after they left, Mr. Hobbs heard that they had a wreck so he rode with someone to the scene. When Mr. Hobbs got to the bottom of the hill, all he could see were flashing lights. He ran up to the wreck and saw appellant's car. Appellant was still in the car, propped up in the middle between the bucket seats, and he was being cut out of the car. Appellant's legs were underneath the dash area of the car and he appeared to be straddling both sides. Mr. Hobbs was not certain whether appellant was conscious. The next morning, Mr. Hobbs saw appellant at the hospital. Appellant told Mr. Hobbs he couldn't believe what he'd done and that he had wrecked the car.
On cross-examination, Mr. Hobbs stated that he didn't do any drugs that night and didn't drink anything. He admitted his mother is concerned about losing her house in a lawsuit over this incident. Mr. Hobbs testified that his mother saw a lawyer who told her she wouldn't lose her house because she asked the minors to leave as soon as they arrived. Mr. Hobbs testified that the minors were there no longer than ten minutes when she asked them to leave.
Mr. Hobbs testified that Angel drove her car over to Mr. Hobbs' mother's house when they left his home. While Mr. Hobbs and his wife walked to the party, everyone else drove. Mr. Hobbs also testified that the group was going to stop at the car, pick up a jacket, and then leave the party.
Mr. Hobbs testified that he recalled an attorney named Mike Mearan coming to talk to him but he didn't tell him much. Charlotte was with Mr. Mearan. Mr. Hobbs admitted he was probably doing drugs at that time but said he did not have marijuana in his hand.
 Mark Griffith
Mark Griffith testified that on October 30, 1999, he, his wife, and his three children were at their pastor's farm. Mr. and Mrs. Griffith drove separate vehicles and left the farm around 9:30 or 9:40 p.m. Mr. Griffith's vehicle was ahead of his wife's and the couple's son, Derrick, was in Mr. Griffith's vehicle. Brandon, who was thirteen years old, and Rebecca, who was two years old, were in Mrs. Griffith's vehicle. The vehicles were traveling west on Route 348.
Mr. Griffith noticed two vehicles that were very close together traveling in the opposite direction. The front vehicle lost control and began to "fishtail." Mr. Griffith slowed down and went off to the right side of the road to give the vehicle a wide berth. The vehicle "fishtailed" four or five times before it swerved behind Mr. Griffith's vehicle and in front of Mrs. Griffith's vehicle. The vehicle struck the front end of Mrs. Griffith's van. Mr. Griffith testified that the vehicles were going fairly fast but he could not estimate the speed.
Mr. Griffith testified that he stopped his car, told his son to remain in the car and lock the door, and went back to the van. Mrs. Griffith's van was sitting at the side of the road and the front end was totally gone. Mr. Griffith's brother-in-law, who was driving behind Mrs. Griffith, was pulling Brandon out of the passenger side of the vehicle. Mr. Griffith went to his wife to make sure she was okay and then removed his daughter from her car seat. Mrs. Griffith was in the driver's seat with her seat belt on. She was having trouble breathing, her legs were hurting her, and she was slipping in and out of consciousness. The dash and the seat were pushed up to the point where Mrs. Griffith could not exit the vehicle. Brandon did not have his seat belt on and his head struck the windshield. He required twenty-nine stitches in his head and had some glass in his forehead. His hip was dislocated, his spleen lacerated, and his heart bruised. Brandon still has pain in his hip and is unable to fully participate in sports.
Mr. Griffith testified that he saw at least two occupants of the other vehicle involved in the crash lying on the ground but did not see anyone inside the vehicle. One of the people was lying about twenty to twenty-five feet away from Brandon and the other person was on the other side. Neither person was moving.
On cross-examination, Mr. Griffith testified that his brother-in-law took his shirt off and wrapped it around Brandon's head. When Mr. Griffith came over to Brandon, his brother-in-law left. Mr. Griffith asked him to come back so he could return to his wife.
 Pam Griffith
Pam Griffith testified that she was following her husband home from a picnic on the evening of October 30, 1999 because she does not like driving in the dark. The couple met at the picnic because Mr. Griffith came from work.
Mrs. Griffith testified that she could only recall a vehicle swerving to the right and then something coming out of nowhere and being directly in her face. Next, Mrs. Griffith recalled someone running around the scene screaming and her sister-in-law coming over. Mrs. Griffith could see someone lying on the ground near her van. She testified that the van was totaled because the whole front end was gone. Both of Mrs. Griffith's knees were broken, her foot was crushed, and she had two broken bones in her hand. Mrs. Griffith testified that she was unable to get out of the van because the dashboard had come down on top of her legs. The paramedics helped her out of the vehicle, cutting the seat belt off.
Mrs. Griffith recalled Brandon saying "oh my gosh" when the crash happened. Brandon tried to climb out the window and Mrs. Griffith's brother-in-law came and grabbed him. Mrs. Griffith's daughter had bruises on her shoulders and between her legs from the car seat, and she bit her tongue.
 Brandon Griffith
Brandon Griffith testified that he was thirteen years old on October 30, 1999. Brandon testified that he saw his father swerve to the right and the next thing he knew, something hit the van. Brandon's hip was dislocated, his spleen was torn, his heart was bruised, and he had a gash in his knee and in his head. Brandon testified that his head went through the windshield and there was a piece of glass in his forehead. As he was crawling out of the van, his uncle came and pulled him out. Brandon observed his uncle trying to calm down some girls. Brandon laid down on the ground in front of the van.
On cross-examination, Brandon testified that he was not knocked out by the accident but he could not recall what the girls said.
 Tim Mosley
Tim Mosley testified that he is appellant's uncle and Shirley Hobbs is his sister. On October 30, 1999, he was at Shirley's house for a Halloween party. Mr. Mosley first saw appellant about a half-hour to forty-five minutes before dark at Mike Hobbs' house. Mr. Mosley parked his truck at Mike's house so that it wouldn't be blocked in by other vehicles. Charlotte, appellant, Mike, Mike's wife, Randy, Craig and Angel were at Mike's house. Mr. Mosley walked to Shirley's house while everyone else stayed at Mike's. Mr. Mosley saw them about twenty minutes later at Shirley's house.
Mr. Mosley testified that he believed appellant left the party about forty-five minutes after he arrived, though he was not certain. Mr. Mosley was standing at the end of Shirley's driveway with Mike Hobbs, Heath Emmons, and Heath's wife when appellant left. Mr. Mosley asked the group not to leave because they didn't need to be out on the road. Mr. Mosley stated that appellant had been drinking alcohol before he left.
Mr. Mosley testified that everyone jumped in Charlotte's truck and he told them, "Well, you're not going nowhere" because there were too many people in the truck and they would get in trouble. Everyone but Charlotte and Beth exited the truck, and Charlotte backed out of the driveway and left. A couple minutes later, appellant, Craig, Randy and Angel got in appellant's car and left. Appellant was driving, Craig was in the passenger seat, Randy was behind the driver's seat, and Angel was behind the passenger's seat.
Mr. Mosley learned of the wreck from Shirley's niece. Mr. Mosley was uncertain how long after the group left that he heard about the accident but estimated that it was about a half-hour to forty-five minutes later. Mr. Mosley went to the scene and saw a van sitting in the road and appellant's car on the left-hand side of the road. When he arrived, they were cutting appellant out of the car. Craig was lying near the ditch, Angel was closer to the car, and Randy was up on the bank. Angel and Randy were covered up and the emergency personnel were working on Craig.
On cross-examination, Mr. Mosley testified that he told the minors they weren't allowed to drink anything and he watched the punch to make sure they didn't drink any. Mr. Mosley did not remember the minors being asked to leave and admitted that he never asked them to stay at the party. Mr. Mosley gave appellant a jacket to wear because it was chilly outside. The other members of the group stated that they were also chilly and Mr. Mosley told them he had two or three sweatshirts and jackets in his truck.
Mr. Mosley testified that Mike Hobbs' house is about 100 yards from Shirley's and, during parts of the year, one can see Mike's house from Shirley's driveway. When there are no leaves on the trees, one can see to the end of Route 104.
Mr. Mosley testified that Charlotte left two to five minutes before appellant; they did not leave together. At about the same time Charlotte was pulling out, Mr. Mosley asked appellant not to leave and appellant indicated that he wasn't and that he was going to spend the night with Mike.
On redirect examination, Mr. Mosley testified that appellant was driving when the Cougar pulled out of the driveway. The car went to the end of the road Shirley lives on and then turned right, towards Lucasville.
 Beth Mosley
Beth Mosley testified that she is nineteen years old and that Randy, her brother, was sixteen years old. Appellant is her cousin. On October 30, 1999, appellant and Craig were at her house around 12:00 p.m. Appellant was drinking around 12:30 p.m. and then she, appellant, and Craig went to the Lucasville Bottoms. Appellant later dropped Ms. Mosley off at Charlotte's house.
The next time Ms. Mosley saw appellant was at Mike Hobbs' house when she and Charlotte stopped there before the party. Craig, Randy and Angel were also there. The group got into their vehicles and went to Shirley's house. Ms. Mosley testified that Teddy was drunk. They stayed at Shirley's for a half-hour to forty-five minutes. Ms. Mosley got into Charlotte's truck, along with Randy and Angel. Because it was cold, Randy and Angel got out of the truck and into appellant's car. Charlotte backed out of the driveway and waited for appellant to back out and drive in front of the truck. Appellant was driving, Craig was in the passenger's seat, Randy was in the back behind the driver's seat and Angel was in the back passenger's seat.
As they traveled down the road, Charlotte passed appellant and then appellant passed Charlotte and continued down the road. The passing continued with the vehicle speeds increasing. As the truck was traveling down the hill, appellant passed the truck again. When the car was getting ready to get back in front of the truck, Randy turned around and waved. Appellant's car lost control and hit the van, throwing the bodies out of the car. Charlotte pulled her truck over on the other side of the road, a bit past the wreck.
Ms. Mosley jumped out of the truck and ran to appellant's car. She testified that she didn't see anyone in the car and saw the bodies lying on the ground. She went to Craig's body but didn't think he was alive. She then went to Angel who was already dead. Ms. Mosley testified that she couldn't find her brother at first and then saw him lying on a bank with his head on a brier bush. She picked him up and he started gurgling.
On cross-examination, Ms. Mosley testified that she took half a Lorcet on the day of the accident and Charlotte was also snorting pills and drinking alcohol. She did not see anyone taking drugs at Mike's house. Ms. Mosley further testified that she smokes marijuana and had smoked a joint earlier on the day of the accident, when she woke up. Ms. Mosley testified that she had less than half a glass of punch, which was mixed with whiskey, at Shirley's house. Shirley gave Randy a hug at the party and told him not drink there because she knew his father didn't allow it.
Ms. Mosley testified that no time passed between the two vehicles leaving Shirley's house. The two cars were "rat racing" one another, going back and forth around each other. Charlotte was driving about 110 miles per hour and the cars were pretty close to one another. Ms. Mosley recalled hollering "slow down, slow down" when appellant's car lost control. A piece of appellant's car or the van came off and struck the passenger side windshield of Charlotte's truck. Ms. Mosley testified that she did not feel any contact between the truck and appellant's car.
Ms. Mosley testified that she did not know appellant was in the back seat of the automobile until she walked to the other side of the car and saw Randy. Appellant was hollering for help getting out of the car. Appellant's right foot was hanging out the door and he was trapped in the back seat. The back bumper of the car was up in a ditch. Ms. Mosley denied jerking the bodies around and testified that Randy was not face down when she saw him. Ms. Mosley recalled screaming and yelling, "Tell my brother he has to wake up to go home."
Ms. Mosley acknowledged that she gave a statement five or six days after the accident but the patrolmen did not speak to her at the scene of the accident. Ms. Mosley also testified that she thinks the accident was her fault because if she hadn't gone with Charlotte, Randy would not have gone with appellant.
On redirect examination, Ms. Mosley identified the statement she gave to the highway patrol.
On re-cross examination, Ms. Mosley acknowledged that in her statement to the highway patrol she stated that Charlotte was doing pills and drinking alcohol. Ms. Mosley testified that the highway patrolman did not ask her about her own drug use. Ms. Mosley stated that she knows appellant was driving the Cougar because they left the party together and the car never stopped to switch drivers. She also stated that she saw appellant's right foot hanging out of the passenger side door. It looked like he was trying to get out but couldn't because his left foot was stuck under the steering wheel. Ms. Mosley stated that she did not know exactly how his foot was in the car.
 Charlotte Blanton
Charlotte Blanton testified that she is twenty-nine years old, that appellant and Randy are her cousins, and that Shirley Hobbs is her aunt. Ms. Blanton testified that appellant and Craig dropped Beth off in Lucasville around 6:30 or 7:00 p.m. on October 30, 1999. Appellant did not appear to be drunk. She also saw Mike Hobbs and appellant at the Pit Stop sometime before she went to Mike's house that evening.
Ms. Blanton testified that she was driving a Toyota 4-Runner with a four-cylinder engine. She went to Mike's house with Beth. Craig, Randy, Angel and appellant were at Mike's house, along with Mike's babysitter and some of Mike's friends. Ms. Blanton did not see appellant drinking anything at Mike's house. The group stayed there about a half-hour, leaving Mike's about 9:00 p.m. to go to Shirley's. Ms. Blanton drove to Shirley's house. Appellant's car was at Shirley's house, though Ms. Blanton did not know who drove it over.
Around 9:45 or 9:50 p.m., the group left Shirley's house to meet another cousin at the Briar Patch. Appellant did not really want to leave but Ms. Blanton asked him if he wanted to go see what Jerry was going to do. Ms. Blanton backed out of the driveway and then waited for appellant to leave. Beth was in the truck with Ms. Blanton. Randy and Angel crawled in the back of the truck but somebody said something about riding in the back so they got out. When Ms. Blanton drove onto Route 348, she went around appellant and got in front of his car and then his car passed the truck and the wreck occurred. Ms. Blanton testified that appellant was driving when they left Shirley's and she did not see them stop.
Ms. Blanton pulled over to the right side of the road and approached the wreck. The car was in the field with the headlights facing the fence. Three people had been ejected from the car but Ms. Blanton could not find appellant. Eventually she saw him pinned in the back seat. Craig was lying next to the car, Angel was close to the road, and Randy was on the hill. Ms. Blanton could not find a pulse on Angel or Randy but Craig was still alive.
Ms. Blanton stated that she pled guilty to three counts of vehicular homicide and a couple counts of assault for her role in the accident. She may be sent to the penitentiary. Ms. Blanton testified that she considers herself partly responsible for the accident because she asked appellant to leave the party and passed his vehicle.
On cross-examination, Ms. Blanton testified that she did not recall Mike or Shirley Hobbs asking anyone to leave the party. The group only left because they wanted to meet another cousin at the Briar Patch. Ms. Blanton did not observe Mike doing any drugs that night. She recalled going to talk to Mike with her attorney, Mr. Mearan, a few weeks ago. Mike would not talk to him.
Ms. Blanton testified that she saw appellant and Mike earlier that day at the Briar Patch. Mike was driving appellant's car and they were getting ready to pull out onto the road. When Ms. Blanton asked them where they were going, they responded that they were going back to Mike's house. Ms. Blanton denied that she was doing drugs that evening or earlier that day. Ms. Blanton testified that Beth was not with her earlier that day; she was not dropped off until 6:30 or 7:00 p.m. Beth was with Ms. Blanton when she saw Mike and appellant at the Briar Patch though.
Ms. Blanton stated that her uncle did not want Angel and Randy riding in the back seat of her truck. She recalled Angel wearing a jacket when they left but was not certain if Randy was wearing one.
Ms. Blanton recalled the horn blowing and the car's lights facing the fence when she got to the accident. Ms. Blanton testified that the windshield of her truck was damaged but she did not notice until the next day. Ms. Blanton was not certain how far behind the impact she was, but noted she was "a good piece back." Ms. Blanton testified that the two vehicles did not touch. Ms. Blanton remembered making statements at the accident scene that the accident was her fault but denied being right behind appellant's car. Ms. Blanton testified that appellant was not in the driver's seat when she saw the car after the accident.
Ms. Blanton testified that she was originally facing eighteen to nineteen years of incarceration but is now facing a maximum of one year, though she has not been sentenced yet.
 Thomas Morris, M.D.
Dr. Thomas Morris testified that he is the elected coroner for Scioto County though his normal practice is eye surgery. Dr. Morris arrived at the scene of the accident at approximately 11:00 p.m. He was directed by squad personnel to two bodies lying about twenty to twenty-five feet away from the wrecked car. Dr. Morris looked at each of the bodies to determine if their injuries were consistent with fatalities caused by a traffic accident. Dr. Morris testified that their injuries appeared to be consistent with the accident; they had chest bruises, neck bruises and loose necks. One of the bodies had bleeding from the ear.
Dr. Morris also drew blood specimens from the two victims still present at the scene, Angel Spradlin and Randy Mosley. Dr. Morris later saw Craig Fitzpatrick at Scioto Memorial Hospital, where he went after he finished at the traffic scene. Dr. Morris learned that Craig had died. His injuries were also consistent with a traffic fatality.
Dr. Morris testified that he has a certified copy of appellant's lab report. He testified that if one tested at 124 milligrams of alcohol per deciliter, he would be under the influence of alcohol. The presumption of driving under the influence of alcohol in Ohio is .10; 124 milligrams per deciliter would be the equivalent of .12.
On cross-examination, Dr. Morris testified that the injuries to the bodies were to the upper rather than the lower extremities. Dr. Morris did not notice if one side of the bodies was more damaged than the other side as he had no reason to look for that. Dr. Morris testified that he smelled alcohol on the two bodies. Randy showed marijuana metabolized in his blood; Craig and Angel showed alcohol in their blood.
 Charles Heath Emmons
Charles Heath Emmons testified that he was at Shirley Hobbs' house on the evening of October 30, 1999. He was standing at the end of the driveway talking to Mike Hobbs. Appellant, Randy, and some others got into appellant's car. Charlotte and Beth got into the truck. They were going to the Briar Patch to meet Jerry Mosley. Mr. Emmons and Mike tried to talk them out of leaving because they'd been drinking. Appellant was driving when they left. Mr. Emmons saw them drive towards Route 348 but couldn't see them turn onto Route 348 because of the trees.
On cross-examination, Mr. Emmons testified that Route 348 is about 150 to 200 yards away. Mr. Emmons further testified that Mike did not have a costume on and he did not recall anyone having jackets on. Mr. Emmons did not hear anyone ask the group to leave because they were minors. Mr. Emmons acknowledged that he was drinking that evening. When they started to pull out, he turned around to talk to Tim Mosley and did not pay attention. Approximately one to two minutes passed between the vehicles leaving.
 David Richendollar
David Richendollar testified that he is a trooper with the Ohio State Highway Patrol. On October 30, 1999, Trooper Richendollar went to the scene of the accident around 10:00 p.m., along with Sgt. Rutherford. When the two arrived, no other emergency personnel were present. Sgt. Rutherford parked his patrol car on the road and Trooper Richendollar could see a car off to the right side of the road in a ditch. Trooper Richendollar drove down so he could shine his lights on the cars involved. Sgt. Rutherford went to the vehicle up on the road so Trooper Richendollar went to the car in the ditch. The driver's side was facing Trooper Richendollar and the vehicle front was pointing towards the road.
Trooper Richendollar went around to the passenger side and saw a deceased female lying on the ground face first. He turned around and noticed a person in the car facing the passenger side. He was upside down, hanging outside the car. The person was trying to move his head up and within a short time, someone came running up to that side of the car so Trooper Richendollar knew he had some help. Trooper Richendollar noticed another person lying up on the embankment and went to check on him. That person was obviously deceased. Trooper Richendollar could see another victim alongside the road and two or three people helping him. A girl was standing up on the bank next to the body lying on the hill. She was screaming so Trooper Richendollar thought she was involved in the wreck. He went to check on her and she screamed out that he was her brother. She had no obvious injuries.
By this time, the ambulance and fire departments were arriving at the scene. Trooper Richendollar tried to find Sgt. Rutherford. He went up to the road and found the other vehicle involved, a mini-van. On the way there, Trooper Richendollar was met by a woman carrying a small child who she said was involved in the wreck. Trooper Richendollar instructed her to go to the first squad she saw. There were no observable injuries to the child.
Trooper Richendollar then came in contact with the driver of the mini-van. She appeared very badly hurt and was having trouble breathing. Trooper Richendollar called some emergency personnel over to try to take care of her, which they did. Trooper Richendollar then tried to determine what happened and who was involved. The Mercury Cougar no longer had a passenger compartment per se. The passenger seat was shoved against the driver's seat. Trooper Richendollar first went around to the side of the car. The man there had on a black jacket; his feet were inside the vehicle with most of his top extremity outside. He tried to pick up his head and raise it. One of the squad personnel came over to try to hold him up. The man was facing the front of the car with his back bent over the side of the car. His head was close to the ground. Some of the medical personnel had climbed into the back seat of the car. When Trooper Richendollar started looking at the car, he realized that the person in the back seat was the same person he had seen lying partially out of the car. The man's feet were towards the front of the car and his head was on the back seat. Trooper Richendollar never saw exactly where his legs were but could tell they were trapped someplace. Trooper Richendollar testified that when he arrived, the driver's door was shut. The fire department eventually removed the top of the car. Trooper Richendollar identified appellant as the person he saw in the vehicle.
Trooper Richendollar recalled seeing a Toyota 4-Runner sitting off the side of the road when he left the scene. At the time, he assumed it belonged to one of the emergency personnel. He later had a difficult time tracking down the vehicle and did not find it until about ten days after the accident.
Skid marks on the road showed that the car slid into the van. The Cougar made the skid marks, not the van. The marks were left because of the force of the vehicle pushing the tires. The marks end where the impact with the van occurred. Trooper Richendollar also testified that there were gouge marks from the van which were made from metal digging into the pavement. The van was knocked back approximately six feet from the impact. There was no evidence of the van braking.
On cross-examination, Trooper Richendollar testified that he heard sirens in the background when he got out of his vehicle. The emergency personnel probably arrived two or three minutes after Trooper Richendollar.
Trooper Richendollar testified that there was no sign of braking by the Cougar. There was no obstruction or visual hampering on that road and no explanation for the accident when just examining the roadway. The marks on the road were left by the tires sliding across the pavement.
Numerous people arrived at the crash scene, including a lot of family members. Five or six people were extremely hysterical and the sheriff's department handled most of the crowd control while the highway patrol conducted its investigation. Trooper Richendollar was the lead investigator. Three fire departments were present, along with six or seven emergency squads. Two helicopters were also called, probably by the squad personnel. They landed approximately twenty minutes after Trooper Richendollar arrived.
Trooper Richendollar did not recall the horn on one of the vehicles blowing. Trooper Richendollar identified Randy as the deceased boy on the bank. Craig was alongside the road, closest to the van. Trooper Richendollar never saw Brandon. He observed blood, presumably from appellant's head, all over the top of the back seat of the car.
Trooper Richendollar testified that the accident was almost a pure "T-bone," with the van striking the car in the passenger side. At the moment of impact, the motion went from left to right.
Trooper Richendollar kept track of which hospital everyone went to so that blood could be drawn and statements could be taken. He also kept track of which officers were doing which tasks, essentially "managing" the crash scene. Trooper Richendollar acknowledged that he was not trying to interview anyone; he was concerned with saving people. By 11:57 p.m., he was doing inventory. He cleared the scene around 12:40 a.m.
On the evening of the crash, Trooper Richendollar did not try to determine where each of the car passengers was sitting. There was no physical evidence to determine seating. The patrol determined where the occupants were sitting based mostly on witnesses' statements. DNA testing was not conducted because the car was too contaminated by squad personnel. However, that evening, Trooper Richendollar and Sgt. Rutherford wrote down where they believed everyone was sitting. Trooper Richendollar acknowledged that he did not put anyone in charge of talking to witnesses and no list was compiled of eyewitnesses to the accident.
Trooper Richendollar recalled talking to Mark Griffith about two days after the accident. Mr. Griffith informed him of the possibility that the truck and the Cougar collided. Trooper Richendollar also began receiving phone calls from the Mosley family, saying they knew something about the crash and wanted to talk to the patrol. Appellant was unable to talk because of his injuries. Trooper Richendollar had a difficult time locating Charlotte's vehicle after he learned of her possible involvement. She contacted the patrol on November 10th. Trooper Richendollar acknowledged that Beth and Charlotte's statements were some of the reasons the patrol concluded that appellant was the driver. He did not know if accident reconstructionists had tried to determine where the occupants were seated based on where their bodies landed. Trooper Richendollar concluded that drugs or alcohol were involved in the accident because of the odor of alcohol on the victims. Trooper Richendollar testified that he believes that everyone came out of the right side of the vehicle; the glass in the driver's side door was still intact. The front windshield was shattered and both the passenger side and rear windows were shattered. There was no indication that anyone went through the windshield. Instead, everyone went to the right until the car began to rotate. Then, everyone would be shoved to the left. Trooper Richendollar had no doubt that Craig was in the front passenger seat because of where his body was located.
Trooper Richendollar acknowledged that his wife is a distant relative of Craig Fitzpatrick's. Trooper Richendollar also testified that he asked the tow truck driver to cover up the car. There was no determination that hair or scalp samples existed in the car.
Trooper Richendollar testified that Charlotte told the patrolman that she was a football field behind appellant's car. However, this statement is not consistent with the damage to her windshield. Several patrolmen looked for damage to the back end of the Cougar and the front of the 4-Runner but could not find any damage, except for damage to the Cougar from its contact with the small ditch after the crash. Trooper Richendollar acknowledged that the bumpers would absorb some impact without a great deal of damage. After being shown a picture of the 4-Runner, Trooper Richendollar stated that its license plate is wired on and there may be some damage to the license plate.
On redirect examination, Trooper Richendollar stated that he did not know when that picture was taken and whether it accurately depicted the bumper as it appeared in October 1999. Trooper Richendollar reiterated that no one from the patrol saw any evidence of a collision between the Cougar and the 4-Runner after examining both vehicles. Before talking to the witnesses, Trooper Richendollar concluded that Craig was the front seat passenger, appellant was the driver, and Randy and Angel were back seat passengers.
 Brian Rutherford
Sgt. Brian Rutherford testified that he received a phone call regarding the accident at 9:57 p.m. on October 30, 1999. He and Trooper Richendollar arrived at the scene at 10:05 p.m. When they arrived, there were several vehicles belonging to emergency medical technicians (EMTs), several fire department vehicles, and two vehicles involved in the accident. There were three bodies lying on the ground surrounding the Cougar and one individual hanging out the passenger side of the Cougar. The upper half of his body was sticking out past where the passenger side window would normally be and his feet were under the steering column of the vehicle. Sgt. Rutherford later learned that this person was appellant.
Craig Fitzpatrick was still conscious when Sgt. Rutherford arrived. He was talking to one of the paramedics and Sgt. Rutherford leaned down and spoke with him. Craig told Sgt. Rutherford he was extremely cold and Sgt. Rutherford went to get him a blanket. As Sgt. Rutherford was returning to Craig, Craig was surrounded by three or four paramedics, placed on a stretcher and put in an ambulance.
Sgt. Rutherford testified that his primary task was taking measurements, marking where the vehicles were, and marking where the bodies were. He asked Trooper Brad Johnson to take photographs, which Sgt. Rutherford initially started. Sgt. Rutherford took photographs of the mini-van, started the field sketch, and took measurements of the positions of the vehicles and other evidence. The following day, Sgt. Rutherford took daylight photographs of the crash scene.
Based on these measurements and sketches, the patrol was able to determine that the Cougar was heading eastbound on State Route 348 and the Ford Aerostar van was heading westbound. There were speed marks from the Cougar caused by a tire "side slipping" and still rotating. In other words, the vehicle was traveling at a speed too excessive for the vehicle to maintain traction on the roadway. The vehicle rotated in a counter-clockwise direction. The impact occurred toward the rear of the Cougar. As the Cougar started to disengage from the front end of the van, Craig was ejected. As the vehicle continued to rotate around, Angel's body was ejected and then Randy was ejected. The vehicle came to rest against the hillside because the left rear fender and the left rear corner of the bumper came into contact with the embankment. Once the van disengaged from the Cougar, it was shoved backwards approximately four feet. There were no braking marks from the van. Sgt. Rutherford testified that he examined both of the vehicles within a few days of the accident but never examined the Toyota 4-Runner.
On cross-examination, Sgt. Rutherford acknowledged that he has no training in reconstruction but has some experience from investigating other accidents. Sgt. Rutherford testified that he and Trooper Richendollar were the first patrolmen on the scene but there were approximately fifteen to twenty fire department employees there. An emergency medical squad arrived a short time after the troopers. When he arrived at the scene, Sgt. Rutherford parked behind the van and Trooper Richendollar parked immediately behind him. Sgt. Rutherford ran past the passenger side of the van, looked at the damage on it and noticed Craig lying on the ground. Sgt. Rutherford immediately went to Craig without looking inside the van. When Sgt. Rutherford looked at the front of the van, he saw the driver but he did not see Brandon.
Sgt. Rutherford testified that appellant's feet were hung up underneath the steering column of the vehicle near the accelerator pedal and the brake pedal. Appellant was hanging out what used to be the passenger side. His arms were draped over his head and his upper body was outside the vehicle. The emergency personnel placed appellant in the back seat.
Sgt. Rutherford testified that he interviewed Beth Mosley. He asked her about alcohol but not about drugs. Sgt. Rutherford testified that his theory of the accident was that the Cougar had either been passing or going extremely fast. After the patrol talked to Mr. Griffith, people began speculating that the Cougar may have been tapped by Charlotte's truck. Beth and Charlotte's statements corroborated the patrol's speculation as to where the occupants were sitting. The patrolmen did not know that appellant owned the vehicle until they returned to the post. Sgt. Rutherford acknowledged that his primary focus was to gather evidence; he did not talk to any witnesses at the scene or make an eyewitness list. No DNA or fingerprint testing was done on the Cougar and the car was not checked for hair samples. No one was called to the scene who was qualified to do such testing.
Sgt. Rutherford testified that when Trooper Richendollar took the tire pressure of the Cougar, the right front tire had twenty-four pounds of pressure and the left front tire had thirty-four pounds of pressure. He did not know if the difference would cause the car to pull or to drift. There was damage to the left rear fender, taillight, and the trunk area from the Cougar's contact with the bank.
On redirect examination, Sgt. Rutherford testified that the fire department employees who were administering first aid when the patrolmen arrived had driven their personal vehicles and parked on the side of the road. There were approximately twenty cars on either side of the roadway. The fire trucks and squad vehicles were still on their way when the patrolmen arrived.
On re-cross examination, Sgt. Rutherford admitted that he had a conversation with Trooper Richendollar about this during the break. The fire department employees' vehicles had small red flashers on them and some had oscillating lights.
 Larry Anderson
Trooper Larry Anderson testified that he did some of the damage analysis on the vehicles involved in the accident. He was never at the scene but did the analysis approximately a day after the accident. Trooper Anderson went to the salvage yards, measured the damage to the vehicles and helped with weighing the vehicles. These examinations were done to determine how the vehicles came together and the information was sent to an accident reconstruction expert in Columbus. Trooper Jeff Moseley received the information. Trooper Anderson looked at the bumper cover of the Cougar and saw no indication that another vehicle had any involvement in the crash. He never looked at the Toyota 4-Runner.
On cross-examination, Trooper Anderson testified that he would look for paint transfer between the two vehicles to determine if there was contact.
On re-direct examination, Trooper Anderson testified that he examined the Cougar's rear bumper and looked for any kind of contact, paint transfers, or dirt disturbance. He did not find any evidence that the vehicle was struck from behind. Trooper Anderson also testified that the photograph of the 4-Runner taken by the patrol shortly after the accident does not show the license plate being held on by wire or that it was bent.
On re-cross examination, Trooper Anderson acknowledged that the photographs were taken from different angles.
 Jeffrey Moseley
Trooper Jeffrey Moseley testified that he is employed by the Ohio State Highway Patrol and assigned to the crash reconstruction unit in Columbus. He is not related to appellant and his last name is spelled differently. Trooper Moseley was declared an expert witness without objection.
Trooper Moseley testified that he came down to Scioto County on November 5, 1999 and went to the scene of the crash with Sgt. Rutherford. While at the scene, Trooper Moseley did forensic mapping of the area. He also went to the impound lot and observed the damage to the Mercury, though he did not see the van. Trooper Moseley reviewed all the photographs and reports and ultimately created a scale drawing based on the physical evidence mapped at the scene. He then determined the speed of the vehicles through approved scientific methods.
Trooper Moseley testified that there was damage to the rear of the Cougar that, in his opinion, was caused when it struck the ditch. There was no evidence of any paint transfer or rubber transfer from a bumper to indicate another vehicle struck the Cougar.
Trooper Moseley also concluded that the Mercury was traveling 57-67 miles per hour at the time of impact, assuming that the van was traveling 45-55 miles per hour at the time of impact. Trooper Moseley testified that there was a "yaw mark" before the impact. When a car creates a yaw mark, it is slowing down because it is side slipping. Trooper Moseley determined that the Cougar was likely traveling 75-82 miles per hour prior to losing control.
On cross-examination, Trooper Moseley testified that he knew the 4-Runner had damage to its windshield attributed to parts from the crash. This would indicate that the Cougar and the 4-Runner were in close proximity to one another and fairly close in speed. Trooper Moseley testified that the impact to the Cougar occurred slightly ahead of the right rear tire. An unbelted occupant has a tendency to remain where he or she is and the vehicle would be moved from them. Here, the passengers would move from left to right or driver's side to passenger's side at the point of impact.
 Lloyd Eichenlaub
Lloyd Eichenlaub testified that he is a volunteer member of the Rush Township Fire Department and Squad Two of the Scioto County Ambulance District. On October 30, 1999, he was on the squad as an EMT and responded to this accident along with two other EMTs. Mr. Eichenlaub testified that he believed some emergency personnel from the Morgan Township Fire Department arrived before his squad. Mr. Eichenlaub went to the van and the other two EMTs went towards the car. Mr. Eichenlaub checked the two individuals in the van. He then went down to two individuals who were ejected from the car and checked to see if there was a pulse or breathing.
Mr. Einchenlaub then went to the vehicle and saw an individual lying right beside the passenger door with one leg still up on the door. Another individual was still inside the car. He was combative, yelling and moving around. The EMTs opened the driver's side door to try to get somebody in there to keep his head still and keep him calm until he could be removed. The EMTs talked to him and held him to keep him from moving about. Somebody was holding his head and making sure he didn't stop breathing. When the roof was being removed, an EMT was on the trunk, holding the back of his head. That EMT was reaching through where the rear window would have been. Mr. Eichenlaub testified that appellant was lying on the driver's side of the vehicle with his feet toward the steering wheel and his head towards the back. Appellant's back was toward the back of the front seat and he was on top of the front seat, not pinned behind it.
On cross-examination, Mr. Eichenlaub testified that the driver's door was operable though he did not recall if the glass was intact in the door. The car's sunroof was gone. Appellant's foot was not underneath the gas or the brake pedal. His back and feet were in the back seat and he was bleeding. Appellant's head was over toward the driver's side. Nothing was used to cut appellant out from inside the vehicle.
Defense Case-in-Chief
 Chris Helton
Chris Helton testified that he was driving down Route 348 when he saw the wreck. Emergency personnel were already there and their lights were flashing. Charlotte came up to Mr. Helton and asked if he would "take the rap" for driving her vehicle because she did not have a license. Mr. Helton stated that he would not.
On cross-examination, Mr. Helton testified that he never met appellant and did not see anybody in the Cougar. Traffic was stopped so Mr. Helton had to stop up the road from the accident. He exited his vehicle and stood by his car. Mr. Helton believes that a Ford Aerostar van was also involved in the accident. Mr. Helton also recalled a helicopter landing in the road.
 Mortie Throckmorton
Mortie Throckmorton testified that she was called to come get her grandson and told that there had been an accident. Mrs. Throckmorton went down to the accident where she saw Randy's father, Randy Mosley, Sr., kneeling over Randy. Mrs. Throckmorton hugged Randy Mosley, Sr. Then somebody whispered that appellant was in the car and Mrs. Throckmorton went over to the back of the car. Appellant was down in the car and Mrs. Throckmorton had to stand on her tiptoes to see him. Appellant was in the back seat. His head was toward the driver's side and his legs were toward the passenger's side. Mrs. Throckmorton never saw his feet. The top was already off the vehicle. Mrs. Throckmorton also saw Randy and the girl. Mrs. Throckmorton hugged Beth and then went back to Randy Mosley, Sr. Mrs. Throckmorton testified that appellant was not driving the car "unless he can drive it from the back seat."
Mrs. Throckmorton testified that the scene was pure chaos. Children were crying and people were trying to find out who was in the wreck and where people were. Mrs. Throckmorton testified that she is the great-aunt of appellant, Randy, Beth and Charlotte.
Mrs. Throckmorton testified that she spoke to appellant because he was moving around. She told him to lay still and not to move. Beth was crying and screaming, "Mom and Dad is going to hate me." Mrs. Throckmorton went up and hugged her, stating "No, Beth. Mom and Dad ain't going to hate you. You're going to have to be strong now. It's your job." Beth just kept repeating that they would hate her over and over again. Mrs. Throckmorton testified that she could smell liquor on Beth. She was stumbling around, but it seemed that everyone was. Mrs. Throckmorton saw Charlotte there. Charlotte was definitely under the influence of something. Mrs. Throckmorton smelled liquor on her and Charlotte couldn't stand up. She was drooling and slobbering from her mouth and crying hysterically. Mrs. Throckmorton testified that she was there for an hour to an hour and a half.
 Rodney Vulgamore
Rodney Vulgamore testified that he owns a towing business in Lucasville. He was called to an accident by the patrol and when he arrived, the Cougar was off the road on a bank. The side of the Cougar was shoved in two to two and a half feet. A van with massive front end damage was sitting on the highway.
Mr. Vulgamore loaded the car into his truck and took it to his lot in Lucasville. Over the next few days, the highway patrol investigated the car. Numerous people looked at it. Mr. Vulgamore testified that he covered the car numerous times. Originally, it was covered in black plastic and Mr. Vulgamore repeatedly recovered it over the first week or so. It was tarped so that the wind would not blow it off so Mr. Vulgamore surmised that people were removing the tarp.
Mr. Vulgamore testified that he took the defense attorney out to see the car. Mr. Vulgamore had backed the car up to another vehicle and had not moved it until about a month before trial. There are marks on the back bumper of the Cougar which, to Mr. Vulgamore's knowledge, did not occur while it sat on the lot. Mr. Vulgamore testified that the driver's door and glass were still intact and the door would open and close.
On cross-examination, Mr. Vulgamore testified that the Cougar was in Lucasville until three to four weeks before trial and was then moved out to the country. The vehicle was not stored inside or protected from the public.
On redirect examination, Mr. Vulgamore testified that he was never instructed to protect the vehicle. The patrol released the vehicle earlier this year and never instructed him to preserve it.
 Pamela Mosley
Pamela Mosley testified that she is appellant's mother. On the evening of the accident, Mrs. Mosley's boyfriend was paged by his daughter. When he called her, she informed him that there had been an accident. Mrs. Mosley went to Shirley's house and then to the hospital in West Virginia. Appellant was in critical condition and in a coma for three days. He had glass all over his face and in his eye, head trauma, fractured ribs, a broken pelvis, contusions on his lungs and a bruised heart. His chances of survival were uncertain. Mrs. Mosley testified that appellant has memory lapses. The hospital gave Mrs. Mosley appellant's clothing, including a jacket that was cut off of him.
Mrs. Mosley testified that she went with defense counsel to see the Cougar. When Mrs. Mosley saw the seat, she knew appellant could not have been driving it. Mrs. Mosley testified that the seat could not be moved because of the accident. Mrs. Mosley testified that appellant is a "low-rider driver" and he puts the seat "way back." The seat was in a position such that Mrs. Mosley could barely get into it. Mrs. Mosley testified that appellant could not sit in that seat and be the driver. She assumed that the seat was in the same position it was in at the time of the wreck.
On cross-examination, Mrs. Mosley testified that the hospital informed her it would take two weeks to get appellant's medical records.
 Cassandra Wellman
Cassandra Wellman testified that she was an employee of the Nile Township emergency squad in October 1999. As she was leaving the hospital, she was notified to go to the scene of an accident. When she arrived, emergency personnel had already arrived but the helicopters had not. Ms. Wellman was directed to a person lying on the ground. No part of the person was touching the automobile but the person was in close proximity to the car.
 Tina Throckmorton
Tina Throckmorton testified that she received a phone call that there had been an accident. Because her son was not home, Ms. Throckmorton went to the scene of the crash to make sure he was not involved. When she first arrived, Ms. Throckmorton ran to the car. She saw Angel lying near the passenger side with someone doing CPR on her. Angel's feet were facing toward Route 348 and her head was down toward the ditch. Ms. Throckmorton then saw Craig with his head toward the car and his feet pointing towards Route 348. Beth Mosley was leaning over her little brother, who was up on the bank, screaming "Help my bubby." Ms. Throckmorton heard Charlotte screaming and approached her to try to find out who was in the accident. Charlotte smelled of alcohol and had "white foamy stuff" coming out of her mouth. When Ms. Throckmorton could not get Charlotte to answer, she grabbed her face and was trying to hold her up at the same time. Charlotte kept saying, "Teddy's dead. Teddy's dead." When Ms. Throckmoton asked where appellant was, Charlotte stated that he was in the car. Ms. Throckmorton ran down to the car and tried to get appellant to lay still. Ms. Throckmorton testified that appellant was in the back behind the passenger seat and the top of the vehicle was still on. Appellant asked Ms. Throckmorton how she knew him and she told him that she was "Uncle Don and Aunt Mortie's girl, Tina." Appellant's eyes were open and his head was up in the back windshield of the car. He was trying to push himself up and you could not see his feet. Ms. Throckmorton told appellant to lay still and then ran down to the van. The woman was still in the van and her husband was standing by the door trying to calm her down. Ms. Throckmorton then returned to Beth.
Charlotte and Beth kept screaming. Beth said her father was going to kill her because of what happened. She kept trying to move Randy and wanting to know why they weren't helping him. Ms. Throckmorton testified that they had hooked Randy up to a machine and it showed he was dead. Ms. Throckmorton got someone to bring a blanket to cover Randy up and Beth kept trying to uncover him. Beth was very upset and either she or Charlotte said the accident was their fault.
On cross-examination, Ms. Throckmorton testified that she lived in Owensville and got a call from her brother-in-law who has a scanner. Ms. Throckmorton was concerned because her son was out with his friends at the time. Ms. Throckmorton, her sister-in-law, and her younger son went to the scene. When they got close, Ms. Throckmorton told her sister-in-law to stay with her son. Ms. Throckmorton testified that she is related to a number of people in this case. Ms. Throckmorton could not recall if there was glass in the rearview window.
On redirect examination, Ms. Throckmorton testified that from seeing appellant's upper body and head, it was impossible for his feet to be around the steering wheel.
On re-cross examination, Ms. Throckmorton testified that appellant was moving like he was trying to get out of the car.
 Tim Mosley
Tim Mosley testified that he brought appellant a jacket before he went to Shirley's house. He also told appellant that he had more jackets in his vehicle, which was parked in the driveway of the building between Mike's house and Shirley's house. Mr. Mosley testified that he normally keeps several jackets in his trunk. He identified Defendant's Exhibit Q as the liner from the jacket he gave to appellant. Mr. Mosley testified that if appellant had on a different jacket when he arrived at the hospital, he must have gotten it from somewhere. Pam Mosley called Mr. Mosley's wife after the accident and asked if Mr. Mosley wanted his jacket back.
On cross-examination, Mr. Mosley testified that he gave appellant that jacket but also told him he could get the other jackets for the other people if he wanted.
On redirect examination, Mr. Mosley testified that he does not know if appellant stopped and got the jackets after leaving the party.
 Pam Mosley
Pam Mosley testified that Defendant's Exhibit Q is half of a coat which came out of the wrecked car. Mrs. Mosley testified that she received a different jacket from the hospital. The jacket she received was a whole jacket cut two different ways up the back and one of the sleeves. Mrs. Mosley surmised that appellant picked the jacket up at Mike Hobbs' house after he left the party since he had to get the jacket from somewhere.
On cross-examination, Mrs. Mosley testified that she saw the jacket a couple weeks ago when she went to look at the car. Mrs. Mosley's sister-in-law, Tim Mosley's wife, informed her that one of Tim's coats was still in the car. Mrs. Mosley stopped and picked it up to prove that appellant stopped to get the coats.
 Darren Hale
Darren Hale testified that he was traveling westbound on Route 348 and he pulled over to open a can of Copenhagen. Out of the corner of his eye, he saw a vehicle go past and heard a sound like something going around a curve too fast. When Mr. Hale looked up, he saw the two vehicles collide. Mr. Hale testified that it appeared that a body came out of the top of the car. He was in shock, so Mr. Hale sat there for a minute. Someone in a blue or a gray car pulled in front of him. Mr. Hale got out of his vehicle and went up to the accident.
When Mr. Hale got close to the accident, he saw a child lying about four feet off the road with a bad gash in his head. The child asked Mr. Hale where his mom was. When Mr. Hale asked the child where she was, he said she was in the van. Mr. Hale tried to get the child to hold still because he was bleeding badly. It also appeared that the child's hip or leg was dislocated from his body. Mr. Hale then approached a girl who seemed lifeless. He checked for a pulse but didn't find one or see any breath coming out of her mouth. Mr. Hale then went to a third person who had a camouflage jacket on and a "burr" haircut. This person was close to the ditch. Mr. Hale did not know any of these people. Mr. Hale talked to this third victim, who kept asking what happened. The victim kept asking if he was alive and Mr. Hale said, "Yeah, you're alive. You've got to be calm. You got to hold still."
Mr. Hale then went to the driver's side of the car and saw a body in the middle with his head down. He was making grunting noises and leaning to the right. There was also a boy in the back seat in the fetal position with his head down and his legs on the floor. This boy was making gurgling noises. It sounded like he choked and Mr. Hale did not hear anything after that. Mr. Hale then went and checked on the child closest to the road. He was bleeding badly and would not keep the rag on his head. Mr. Hale stayed there a little bit and then went back to the person with the camouflage jacket on and he still seemed okay. Mr. Hale was talking to him and he was asking what happened. When Mr. Hale turned to go back to the car, a man was coming toward the front of the car. The body that was in the front seat was hanging out of the right side of the car. He wiggled his way out and was hanging by the back of his knees with his foot under the dash. The man who was walking toward the car appeared to be in shock and Mr. Hale smacked him in the face to get his attention. Mr. Hale asked the man if he could brace the body of the boy who was hanging out of the car so Mr. Hale could free his foot. The man braced him around the belt and Mr. Hale reached in and bent his toes down to free him. The boy was then lying on the ground. The boy in the backseat was still there and Mr. Hale thought he was dead. Mr. Hale identified appellant as the boy in the back seat.
Mr. Hale then returned to the boy in the camouflage jacket and noticed that he was not talking. His head was face down and he was not responding. A blonde girl and a shorter, dark-haired girl were there. The blonde girl was near the boy in the camouflage jacket, crying and trying to get him to talk. The dark-haired girl was screaming that she thought she had killed him or something. A woman with sandy brown, short hair was holding her from behind. Mr. Hale could hear sirens coming and went back up to the boy when he saw the first state highway patrolman. The patrolman said that anyone who was not a medic should leave. Mr. Hale said, "Well, this boy is bleeding. He is bleeding really bad." The patrolman said to leave so Mr. Hale left. On the way back to his car, the first ambulance pulled in. Mr. Hale told the EMT that they needed to attend to the boy by the road because he was bleeding real bad. Mr. Hale returned to his vehicle and they made him leave without asking his name. Mr. Hale estimated that twenty minutes passed between seeing the impact and the state patrolman.
On cross-examination, Mr. Hale testified that no one was with the boy when he was there. He held his sweatshirt up to the boy's head to keep him from bleeding so much. Mr. Hale testified that he thought the individual in the back seat was dead because he did not feel him breathe when sticking his hand up to his mouth. Mr. Hale did not contact the patrol after the accident to say that he was an eyewitness to the crash.
 Jack Holland
Jack Holland testified that he is a traffic accident consultant. He is a retired highway patrolman and the founder and first commander of the patrol's reconstruction unit. Mr. Holland was certified as an expert witness by the court.
Mr. Holland testified that the accident scene was well plotted. The interpretation and recording of the physical evidence was virtually flawless. Mr. Holland testified that he saw no physical evidence pertaining to where anyone was sitting during the collision. It could be important to gather DNA and fingerprints if you wanted to know who went out which window or the top. Mr. Holland stated that there is usually a transfer of hair and perhaps even flesh, clothing, imprints of pores, or fingerprints. Mr. Holland identified Defendant's Exhibit S as the sunroof of the Cougar which he picked up when he inspected the car the prior Saturday. Mr. Holland concluded that an occupant of the vehicle hit the sunroof or was ejected through it. If someone was sitting on the console, their path would intercept the sunroof and it would be a likely path of ejection. For the driver, it is a less than likely but possible path of ejection.
Mr. Holland testified that the moment of impact was between 1/10 and 1/4 of a second. Trooper Moseley computed the pre-impact speed of the Mercury at 75-82 miles per hour and the impact speed of the Mercury at 57-67 miles per hour, which is an average of 90 feet per second.
When Mr. Holland inspected the Cougar, the sunroof was sitting diagonally across the mid-portion of the car. The car was out in a field among a bunch of weeds and other old cars. Mr. Holland testified that hair and skin samples may have been available immediately after the accident but any bodily tissues or fluids would have deteriorated from sitting outside. A scan for hair, flesh, and fiber can be done locally or by a forensic technician from the BCI. Mr. Holland also testified that you ordinarily store a car so you can examine the underbody if you want to prove speed. To prove operation, you store the car, tarp it, and call in a lab technician. While it is possible that there is still hair in the car, it is unlikely given the exposure to the weather.
Mr. Holland testified that Trooper Moseley's estimate that the vehicle was going 57-67 miles per hour at the moment of impact was reasonable. Mr. Holland testified that the separation velocity was about ten miles per hour and the car would have started rotating on impact. The report states that the car rotated about 133 degrees at a rate of 62 degrees every second. Mr. Holland testified that the clockwise rotation would not have had much effect on the passengers but the initial impact would have had a tremendous effect. The occupants would follow the path that the Mercury was going before it hit the Ford; the general movement of the occupants would be from left to right at about 90 feet per second. The rotation of about 1/6 of a turn every second is not too great but would generate a little centripetal force and tend to move the occupants to the left as the car rotates to its resting position. There was very little speed from front to rear or rear to front. The rear passengers probably collided with the other passengers and were cushioned a bit, but not very much. At impact with the Ford, the car pitched a little bit because the impact was a little low on the car. This created an even better ejection path for those in the car.
Mr. Holland testified that if the occupants did not touch anything on the way out, where they landed would give you a good clue as to who came out first and who was sitting where. However, in a collision like this, the occupants would collide with the interior of the car and collide violently with one another. In an accident like this, you cannot make any assumptions regarding who was sitting where and where they came to rest because the bodies tend to tumble if they change direction. Their flight is interrupted by other occupants, by the car, or by the Ford. The types of injuries suffered would be of assistance. Mr. Holland would expect the people on the right side to have experienced massive right side injuries and perhaps their necks would have been snapped on the left side. Mr. Holland would expect the occupants on the left side to have right side injuries too, but to a lesser extent, because the other occupants would act as cushions for them. Two people colliding at 90 feet per second is going to be almost as deadly as the impact in the side of a car. At the moment of impact, the Mercury rolled over to the right side a bit. This rolling would facilitate an upward movement. Mr. Holland reiterated that the movement of the car and its speed during that movement is not conducive to a change of position from front to rear. There is also not much space between the seat backs in a Cougar and the head rests are high. Mr. Holland testified that if a person was extricated from the back seat of the car, he would expect to see right side injuries and perhaps some injuries caused by the knees going backward, if the knees collided with something inside the car.
Mr. Holland testified that a furrow is a mark made by a tire through loose material, ordinarily grass. The edges of the tire take out the turf and leave the bare ground. Furrows are important because they plot the path of a tire. Mr. Holland testified that there are no furrow marks indicated on the field sketch. When Mr. Holland went to the scene, he did not see anything that looked like a remnant of a furrow or grass that had grown back in a furrow.
Mr. Holland testified that the gathering of witness information at the scene is important. Next to gathering physical evidence, it is the most important evidence to gather. Several witnesses were listed on the front of the patrol's report but they were all occupants or relations of the occupants. The only evidence of who was operating the vehicle was the testimony of the Toyota's occupants. The patrol also relied heavily on the investigator's statement that appellant was found in the front seat and he had to be extricated by the jaws of life. When Mr. Holland looked at the car, he did not see any jaw marks on the dash, though he saw where they cut all the roof pillars off. There were no signs that appellant was extricated from the front of the vehicle.
Mr. Holland testified that the front passengers had a much larger area to be ejected through, as well as the sunroof. The smallest aperture available for ejection is in the rear seat. Therefore, there is a greater likelihood of ejection from the front.
On cross-examination, Mr. Holland testified that it is nearly impossible to predict who was seated where given the ejection patterns.
On redirect examination, Mr. Holland testified that it is likely that if someone was removed from the rear of the vehicle, that is where he was at the time of impact, especially if there was an entrapment.
On re-cross examination, Mr. Holland testified that if appellant's feet were trapped under the steering wheel, that would be a good indication that he was driving. Likewise, the presence of appellant's shoes by the brake and gas pedals would be significant.
On redirect examination, appellant testified that he saw no signs of extrication in the driver's seat area. There was no evidence that the pedals had to be sawed off to release the driver's foot or that there was any downward movement of the dash or wheel. The driver's area appears intact and Mr. Holland did not see any shoes lying near the pedals in the photographs. If shoes were in the car, Mr. Holland believed that it would be recorded and photographed.
State's Rebuttal
 Darren Hale
Darren Hale testified that he does not know Randy Mosley, Sr. personally but he talked to him a little bit ago. He never knew or saw Randy Mosley, Jr. and does not know if he was the individual Mr. Hale helped out of the car.
 John Clay
John Clay testified that he is appellant's cousin and is related to virtually everyone in this case. Shirley Hobbs is Mr. Clay's mother and he was at the party on October 30, 1999. Mr. Clay testified that he saw appellant driving his Mercury Cougar on Cooper Road between 9:00 and 10:00 p.m. Mr. Clay knows they were going to the Briar Patch to meet some friends. Randy, a boy Mr. Clay did not know, and Randy's girlfriend were in the car.
The first time Mr. Clay saw appellant was at the party. Mr. Clay walked from his mother's house to his brother's house, toward Route 348. Mr. Clay had parked near his brother's trailer and was walking back to his car to get some compact discs out of the car. Appellant pulled up beside Mr. Clay, right before Mr. Clay got to his car. Mr. Clay talked to appellant and then appellant, who was driving, pulled off. Mr. Clay did not see appellant after that. The two men spoke at the corner of Route 348, though Mr. Clay acknowledged that he did not see appellant actually drive onto Route 348. After appellant pulled off, Mr. Clay continued to his car. He heard tires screech like they had burned rubber. Mr. Clay turned around and saw the car going toward the Briar Patch. From where appellant was stopped to Route 348 was about 100 yards.
On cross-examination, Mr. Clay testified that he did not recall seeing Charlotte or Beth. When he talked to appellant, his car was not with Charlotte's. Mr. Clay talked to appellant through the passenger window. Mr. Clay acknowledged that he has talked to family members about this. He testified that he would not believe a word Charlotte says and he does not know Beth very well, though she is his cousin. Mr. Clay testified that you can not see around the turn to Route 348 from Shirley's house unless the leaves have fallen off the trees. Mr. Clay did not know if appellant stopped after talking to him. Mr. Clay learned about the accident approximately twenty minutes to a half-hour after talking to appellant. Mr. Clay does not know where the Mercury went during that period.
 Angela Hobbs
Angela Hobbs testified that her husband is Shirley Hobbs' son. Mrs. Hobbs was at the party on October 30, 1999. She testified that she did not drink anything because she was pregnant at the time. Mrs. Hobbs went to the scene of the crash with her husband. She approached the car where the paramedics were moving appellant onto the backboard. Mrs. Hobbs asked if she could help because she is a nurse. She observed the EMTs moving appellant from the driver's side seat onto the backboard but could not see where his feet were. Mrs. Hobbs testified that the backboard was up towards where the passenger seat was.
On cross-examination, Mrs. Hobbs testified that the top section of appellant's body was on the backboard but his legs were on the driver's seat, which was back. Mrs. Hobbs acknowledged that she has read newspapers and talked to her husband about this incident. She also acknowledged that she did not contact the highway patrol or the prosecutor's office with this information.
 Brandon Griffith
Brandon Griffith testified that after the crash, his uncle, Jim Lens, pulled him out of the van when he was trying to climb out the window. His uncle put him on the ground, took his shirt off and put it on Brandon's head to stop the bleeding. Brandon testified that his uncle was with him almost the whole time until he switched places with Brandon's dad. A stranger did not take his sweatshirt off, wrap it around his head, and take care of Brandon.
On cross-examination, Brandon testified that his head went through the windshield. He dislocated his hip and had a lot of damage in his scalp area. Brandon testified that he was bleeding quite a bit but did not have a concussion. Brandon testified that he remembers almost everything, including people screaming and his mom being in the van. Brandon testified that he does not recall other people lying on the ground and he never saw a patrolman.
 Jim Lens
Jim Lens testified that Mark Griffith is his brother-in-law. On October 30, 1999, he was at a picnic at his pastor's house. Mr. Lens and his wife left about five to ten minutes after his brother-in-law and sister-in-law. Mr. Lens was in the passenger seat and his wife was driving. He observed a vehicle go left of center on Route 348; Pam Griffith struck the vehicle. Mr. Lens testified that he was approximately four car lengths behind Pam. He exited the vehicle and immediately approached Pam's van. Brandon was in the passenger seat trying to get out of the window. He was already halfway out when Mr. Lens approached the van. Mr. Lens pulled him out and laid him on the ground. Brandon was bleeding from his head so Mr. Lens took off his black turtleneck and wrapped it around Brandon's head to apply some pressure. Mr. Lens stayed with Brandon until Mark Griffith came over. There was a young lady screaming and Mr. Lens told Mark he was going to go over and try to calm her down. Later on, Mr. Lens returned to Brandon. Mark was still there. Mr. Lens stayed with Brandon and Mark left.
Mr. Lens testified that the individual who the prosecutor pointed out never helped Brandon that evening. He and Mark were with Brandon continuously.
On cross-examination, Mr. Lens testified that he checked on Pam after Mark came over to Brandon. Mark was trying to calm Brandon down. Brandon was complaining of hip pain but there was nothing protruding from his hip. Mr. Lens told him to remain still. Emergency personnel arrived approximately seven to ten minutes after the actual accident. Mr. Lens does not know when the patrolmen arrived.
Mr. Lens testified that he saw two individuals on the ground. He later found out it was Charlotte who he was trying to calm down. She said, "Oh my God. Oh my God. I think I've killed them." Then she said she couldn't find them. Charlotte had on a white shirt and blue jeans but no jacket. Mr. Lens testified that he dealt with Charlotte for approximately two or three minutes. He smelled alcohol on her and she appeared intoxicated. She was pacing. Mr. Lens never turned his back to Mark, Brandon, or Pam when talking with Charlotte. He did not recall other screaming. He was also with Pam for approximately two to three minutes. Mr. Lens testified that he ran a squad years ago so he was familiar with the type of atmosphere at the scene.
 Mark Griffith
Mark Griffith testified that he heard the testimony of Darren Hale and that Mr. Hale did not aid Brandon after the accident. Mr. Griffith testified that when he went back to the van, Jim had pulled Brandon out of the window and Mr. Griffith noticed that Jim did not have a shirt on. He had taken his shirt off and put it on Brandon's head. When Mr. Griffith saw him, Mr. Griffith went over to his wife and checked on her. Mr. Griffith's sister was with her. Mr. Griffith then got Rebecca out of her car seat and handed her to his sister. Mr. Griffith went back to Brandon and he and Jim were on either side of Brandon. A woman had been screaming for several minutes and Mr. Griffith asked who was screaming. Jim said he would go calm her down. Mr. Griffith stayed with Brandon and held the shirt on his head. Mr. Griffith decided to go back to his wife so he called to Jim to come back. When Jim came back to Brandon, Mr. Griffith left him. Mr. Griffith instructed Jim to stay with Brandon. Mr. Griffith did not see Darren Hale there at all and Mr. Hale did not take his shirt off and use it as a compress.
On cross-examination, Mr. Griffith testified that he was not terrified after the accident because he knew his family was okay. When Mr. Griffith saw the vehicles coming down the road, he thought they were traveling fairly close together. Mr. Griffith felt like something was wrong. He noticed one headlight from the rear vehicle, which is how he knew there were two vehicles. The vehicles were not touching one another. Mr. Griffith acknowledged that he asked the highway patrol if it was possible that the second car struck the first.
 Chris Ponzio
Chris Ponzio testified that he is a volunteer firefighter for Rush Township and a volunteer EMT for Squad 2. Mr. Ponzio drove his personal vehicle to the crash scene. When he arrived, he walked to one of the vehicles off the roadway. As he approached, the top of the car was being folded off. Mr. Ponzio stood near the passenger door and asked one of the firefighters how he could help. The firefighter stated that they needed to get the person out of the car. Mr. Ponzio testified that the person was sitting on the back of the driver's seat with his feet under the steering wheel. When Mr. Ponzio approached, another EMT was sitting behind the person holding the C-spine on him and his head was behind what would be the post of the vehicle on the driver's side. The person did not have his shoes on; they were on the driver's floorboard.
Mr. Ponzio stated that he first talked to the prosecutor the day before. Mr. Ponzio believed that Attorney Dave Huddleston, who works for the prosecutor and represents the township, called the prosecutor. On Sunday, Mr. Ponzio and several other firefighters and EMTs was approached by the defense attorney at the fire department. Mr. Ponzio told defense counsel what he told the jury.
On cross-examination, Mr. Ponzio testified that he was not aware of the person in the car being moved around. He does not know how the person's shoes came off but he has seen it in other accidents. The driver's seat was lying down completely in a prone position, on the back seat. An EMT was sitting behind the person. Mr. Ponzio testified that the seat of the car had been moved in the photographs. He acknowledged that appellant was extracted out of the back of the Cougar, across the trunk. Mr. Ponzio testified that he arrived about twenty minutes after the accident. He noted that several people had worked on appellant but nobody had tried to get appellant out of the vehicle before he arrived. Mr. Ponzio testified that it is not normal to move a patient around inside a vehicle unless you're removing him. He has no idea how many people touched appellant.
 Jim Adronis
Jim Adronis testified that he is a volunteer EMT with Squad 2. Mr. Adronis estimated that it took five to six minutes for his vehicle to arrive at the scene after receiving the call. The vehicle Mr. Adronis was in was the first emergency vehicle to arrive at the scene. When he got out of the vehicle, Mr. Adronis noticed several bodies lying around and a lot of debris. Mr. Adronis checked the two patients lying there and presumed the worst. The woman had no pulse and was lying face down without breathing. Another man, who was lying on the hill, had also died. He had severe neck injuries, no pulse and wasn't breathing. His trachea was deviated, an indication of a broken neck. Mr. Adronis could not recall what the man was wearing. The man was not talking and Mr. Adronis doubted he could ever have spoken after the accident. He was also not in any condition to crawl or move up the hill.
Mr. Adronis also saw a gentleman with severe trauma to his face. He was semi-conscious occasionally. When he was conscious, he was trying to raise himself up. Mr. Adronis was concerned about injuries to his neck and bleeding. The man was lying partially on the driver's seat, about midway up with his head towards the back mid-section of the back seat and his legs under the steering wheel where the pedals are. The standard procedure is to hold a C-spine on the injured person to protect his neck and cervical spine but Mr. Adronis could not get in the vehicle to do that. By that time, a female EMT from another squad came along. She squeezed into the car and held the C-spine. Mr. Adronis went to get other equipment. Mr. Adronis testified that it would have been impossible to get appellant out of the vehicle, unless the car was on fire.
On cross-examination, Mr. Adronis acknowledged that he briefly read newspapers about this incident. He also talked to friends at the squad house on Sunday and the defense attorney came out and spoke with him. Mr. Adronis did not recall telling the attorney that everything in the car was torn up so badly you really couldn't tell anything. Mr. Adronis testified that no emergency vehicles or ambulances were there when he arrived. He did not know if the patrolman was present yet. Mr. Adronis testified that he did not notice a body next to the passenger side.
On redirect examination, Mr. Adronis testified that the topic of shoes on the floorboard of the vehicle was discussed on Sunday. Mr. Adronis testified that he thinks that appellant was lying on the seat.
 Gene Johnson
Gene Johnson testified that he is a volunteer firefighter with the Rush Fire Department and a volunteer EMT with Scioto Squad 2. Mr. Johnson testified that this past weekend he was with some squad members from Scioto Squad 2, including Chris Ponzio and Jim Adronis. Defense counsel and a couple of his employees were there discussing the accident on October 30, 1999. During the discussion, Chris Ponzio stated that appellant's shoes were seen on the driver's side floorboard.
On cross-examination, Mr. Johnson testified that he works with Chris Ponzio, Lloyd Eichenlaub, and Jim Adronis. He further testified that it is important in their line of work to back each other up. Mr. Johnson testified that he was not subpoenaed but volunteered to come testify. The prosecutor also represents the fire department.
 Lloyd Eichenlaub
Lloyd Eichenlaub testified that he was at the station house on Sunday when the defense attorney was there. Mr. Eichenlaub testified that he heard Chris Ponzio talking about appellant's shoes being knocked off and found on the floorboard of the driver's side.
On cross-examination, Mr. Eichenlaub acknowledged that he did not see shoes listed on the auto inventory taken by Officer Richendollar.
Defense Surrebuttal
 John Swords
John Swords testified that he is a pre-law student at Capital University. He was with defense counsel last Sunday when talking with some EMTs at Rush. Defense counsel told Mr. Swords to remember the key points of their statements but Mr. Swords remembers almost everything. As far as he can recall, no one ever mentioned any shoes. Mr. Swords testified that he believes Lloyd Eichenlaub said that appellant's head was in the back seat and that he could not recall if appellant's feet were under the steering wheel. Defense counsel asked if he was in the driver's seat and Mr. Eichenlaub said he was one hundred percent sure he was not.